## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **THE CAPE HATTERAS ACCESS PRESERVATION ALLIANCE,**<br> P.O. Box 1355<br> Buxton, NC  27920<br><br>**DARE COUNTY, NORTH CAROLINA**<br> P.O. Box 1000<br> Manteo, NC  27954<br> and<br><br>**HYDE COUNTY, NORTH CAROLINA**<br> P.O. Box 188<br> Swan Quarter, NC  27885<br><div align=right>Plaintiffs,</div><div align=center>v.</div><br>**UNITED STATES DEPARTMENT OF INTERIOR,**<br> 1849 C Street, N.W.<br> Washington, DC  20240<br><br>**UNITED STATES FISH AND WILDLIFE SERVICE,**<br> 1849 C Street, N.W.<br> Washington, DC  20240<br><br>**KENNETH SALAZAR,**<br> Secretary of Interior<br> 1849 C Street, N.W.<br> Washington, DC  20240<br><br>**ROWAN W. GOULD,**<br> Acting Director, U.S. Fish and<br>  Wildlife Service<br> 1849 C Street, N.W.  MS 3238 MIB<br> Washington, DC  20240<br><div align=center>Defendants.</div> | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

_____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, the Cape Hatteras Access Preservation Alliance ("CHAPA"), Hyde County, North Carolina and Dare County, North Carolina (together, the "Counties"), by and through their undersigned counsel, state and allege as follows:

## I.    NATURE OF THIS ACTION

1.    This action, brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 et seq., the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 et seq., and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., seeks judicial review of the decision of the United States Fish and Wildlife Service ("Service") to designate "critical habitat" for the "wintering population" of a small bird known as the piping plover.  In a final rule published in the Federal Register in October, 2008, the Service designated as critical habitat 2,043 acres of North Carolina shoreline—including Units NC-1, -2, -4, and -5, located within the Cape Hatteras National Seashore ("Seashore")—without conducting the proper exclusion analysis under ESA section 4(b)(2), without adequate scientific support, and without conducting an adequate evaluation of the economic and other impacts of the designation.  See 73 Fed. Reg. 62,816 (Oct. 21, 2008) ("Final Rule")(Exhibit "A").

2.    This is the second time this issue is before the Court.  See CHAPA v. U.S. Dep't of the Interior, 344 F.Supp. 2d 108 (D.D.C. 2004)(Judge Lamberth presiding).  There, the Court held that the designation violated the ESA and NEPA. The Court vacated the designation as to units NC-1, NC-2, NC-4, and NC-5 and

remanded to the Secretary of Interior "for further action in compliance with this Order and with the Memorandum Opinion." Id. at 137.

3.    The designation will severely impact Plaintiffs' social, recreational, environmental, and economic enjoyment of the Seashore while providing no additional protection for the species. Plaintiffs include a coalition of local businesses, user groups and individuals that rely on free and open access to the Seashore for recreation and as a source of their livelihood, just as they have since before the creation of the Seashore. Joining Plaintiffs are two counties in North Carolina with areas covered by the critical habitat designation whose lifeblood is the recreational tourist industry of the Outer Banks. Hyde and Dare Counties depend on the public's ability to access local beaches in order to generate sufficient revenue to enable them to provide essential public services and protection. The improper designation of vast tracts of the Seashore severely harms the economic and recreational interests of Plaintiffs and threatens a lifestyle that predates the establishment of the Seashore.

4.    On December 2, 2008, more than 60 days before filing this Complaint, Plaintiffs provided written notice in accordance with 16 U.S.C. § 1540(g)(2)(C) to both to the Secretary of Interior and the Fish and Wildlife Service Director (since retired) of the statutory and regulatory violations which give rise to this lawsuit. The notice is attached as Exhibit "B" and is incorporated by reference. On January 17, 2008, the Service's Regional Director responded acknowledging the December 2 notice letter but took no action to withdraw the Final Rule at issue here, or to

3

otherwise remedy violations of law alleged in the notice. <u>See</u> attached response, "Exhibit C."

5.     Plaintiffs seek to have Defendants withdraw the rule and exempt the units from designation under the ESA. The essence of Plaintiffs' challenge is sixfold: (1) the Service's decision not to exclude the Seashore from critical habitat designation was arbitrary and capricious because the Service relied on a faulty theory that habitat already under management of conservation meets the definition of critical habitat, ignoring its own criteria for excluding habitat based on an analysis of the adequacy of existing management plans; (2) the Service's decision not to exclude the Seashore from critical habitat designation under ESA section 4(b)(2) was arbitrary and capricious because the record demonstrates that the benefits of exclusion outweighed the benefits of designation; (3) the Service's analysis of the economic impacts of the designation was deficient because it arbitrarily relied on the discredited "Vogelsong Study" and failed to adequately discuss "the effects of the designation on everyone who might be affected" as directed by the Court in <u>CHAPA</u>, 344 F.Supp. 2d at 132; (4) the Service failed to satisfy the <u>CHAPA</u> Court's direction that the Service must adequately address how each identified "primary constituent element" (a biological or physical factor essential to the survival of a species) would need management or protection; (5) the Service failed to comply with NEPA because the Service's Finding of No Significant Impact ("FONSI")—that an Environmental Impact Statement is not required—was based on an inadequate Environmental Assessment that relied on flawed scientific

and economic data and analysis and did not adequately address the extensive scientific data and analysis that CHAPA and the Counties submitted during the comment period; and (6) the record demonstrates that the Service failed to make a "rational connection between the facts found and the choice made." Motor Veh. Mfrs. Ass'n v. State Farm Ins., 463 U.S. 29, 57 (1983).  Thus, the designation violated the APA.

## II.   JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal statutes.  Judicial review of a final agency action is authorized pursuant to the APA, 5 U.S.C. §§ 701-706.

7.    Venue in this Court is proper pursuant to 28 U.S.C. §1391(e) and 16 U.S.C. §1540(g)(3)(A).  Declaratory relief is authorized by 28 U.S.C. §§ 2201-2202, and the Federal Rules of Civil Procedure, Fed. R. Civ. P. 57.

8.    This citizen suit is properly before the Court.  The citizen suit provision, ESA section 11(g), states in relevant part that "any person may commence a civil action . . . (c) against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under [section 4 of the Act] which is not discretionary with the Secretary."  16 U.S.C. § 1540(g)(1)(A)-(C).

### A.    Plaintiffs

#### The Cape Hatteras Access Preservation Alliance

9.    Plaintiff CHAPA is a coalition established as a project of the Outer Banks Preservation Association ("OBPA") for the purpose of preserving and

protecting a lifestyle and way of life historically prevalent on the Outer Banks of North Carolina, specifically, Cape Hatteras National Seashore.  The coalition includes the Cape Hatteras Anglers Club (with its 1,100 members), the North Carolina Beach Buggy Association (4,700 members), and OBPA (with over 4,300 active members representing more than 20 states and Canada).  As noted by the CHAPA Court, CHAPA members regularly operate off-road vehicles, the main means for accessing seashore beaches, for both recreational and commercial purposes.  CHAPA, 344 F.Supp. 2d at 116.

10.    Like OBPA, CHAPA has a goal to work with the National Park Service ("NPS") to develop a comprehensive vehicle and pedestrian use and management plan that will meet the concerns of protecting the Seashore's resources without compromising the area's distinctive lifestyle and economic health.

11.    Also like OBPA, CHAPA advocates the protection and preservation of our beaches within a framework of responsible, free, and open access to the sound and to ocean beaches for all users including pedestrians and properly licensed drivers and vehicles.  Such access is fundamental to the continued growth and economic vitality of the Outer Banks.

12.    Many of CHAPA's members reside in eight unincorporated villages that lie within the boundaries of the Seashore.  CHAPA's members, along with many businesses of the Outer Banks, are concerned that the critical habitat designation will lead to substantial limits or an outright ban on motorized access and pedestrian use within designated areas.  Such restrictions will have a

devastating effect on the entire Outer Banks coastal economy and threaten a lifestyle that predates the Seashore.

13.     CHAPA actively participated in the Service's critical habitat rulemaking process by submitting extensive comments.

Dare County

14.     Plaintiff, Dare County, formed in 1870, is located in northeastern North Carolina along the Atlantic seaboard. The County seat at Manteo is approximately 200 miles east of Raleigh, the State capital. The County contains much of what is known as North Carolina's "Outer Banks" resort and vacation areas and contains approximately one-fourth of the North Carolina coastline. It is host to the Seashore, Pea Island National Wildlife Refuge, the Wright Brothers National Monument, and numerous other cultural and historical attractions.

15.     Dare County has a permanent population of approximately 32,000. However, the County's tourism industry results in a large seasonal population with an average daily population from June through August estimated to be approximately 225,000 to 275,000 (a total of five million visitors in 2008). Six municipalities are located within the County: Duck, Kill Devil Hills, Kitty Hawk, Manteo, Nags Head, and Southern Shores. Seven unincorporated villages within the Seashore boundaries are in Dare County. The Seashore is a major tourist destination, attracting approximately 2.2 million visitors per year. The County's economic health is heavily dependent on revenues from tourism; as noted by the CHAPA Court, Dare County's 2001 revenue from tourism was over $365 million.

7

CHAPA, 344 F.Supp. 2d at 116.  Motorized and pedestrian access to Seashore beaches is an essential component of the County's tourist-based economy.

### Hyde County

16.     Hyde County is located in northeastern North Carolina.  Hyde County is one of North Carolina's largest counties by acreage, but has fewer than 5,500 residents.  Attractions include the Ocracoke Island portion of the Seashore. Ocracoke Island, once home to the pirate Blackbeard and now a tourist Mecca, is accessible only by air or water.  As noted by the CHAPA Court, the island and its famous beach is a nationally known tourist destination that depends on tourism, "which generated an economic impact of $24 million in 2001." CHAPA, 344 F.Supp. 2d at 116.  Indeed, Ocracoke Beach was ranked first in a 2007 survey and Buxton Beach was ranked eighth in a 2008 survey of "America's Best Beaches" compiled by Dr. Stephen Leatherman of Florida International University.  Mainland residents make their living farming or commercial fishing while Ocracokers depend heavily on the tourist industry.  Ocracoke Village, an unincorporated community, lies within the Seashore and is the only inhabited area on the island.  A large percentage of the tourism revenue in Hyde County is related to Ocracoke Island— 97 percent of the County's 2007-2008 occupancy taxes were generated there. Unfortunately, County residents—with some of the highest poverty levels in the state—will disproportionately feel the negative economic impacts of critical habitat designation.

8

17.     Both Counties and the municipalities that lie therein are responsible for providing vital health and safety services to their residents.  Beach access and recreation are important to the Counties and to the lifestyles of their residents, from both an economic and environmental standpoint.  The improper designation of critical habitat within the Outer Banks has and will continue to negatively impact both the economic well-being of, and ability to provide governmental services from, Hyde and Dare Counties which directly affects both the residents and visitors to these counties.

18.     The Counties demonstrated their commitment to wise resource use by actively participating in the Service's critical habitat rulemaking process.

**B.     Defendants**

19.     Defendant Department of the Interior is an agency of the United States.  Congress has charged the Department with administering the ESA for non-marine species such as the piping plover.

20.     Defendant Fish and Wildlife Service is an agency of the Department of the Interior.  The Secretary of the Department of Interior delegated responsibility to the Service for the day-to-day administration of the ESA including the listing of threatened and endangered species and the designation of their "critical habitat."

21.     Defendant Kenneth Salazar is the current Secretary of the Department of the Interior ("Secretary"), and is sued in his official capacity.

22.     Defendant Rowan W. Gould is the acting Director of the United States Fish and Wildlife Service, and is sued in his official capacity.

9

23.     All of these Defendants are responsible for the violations alleged in this Complaint and are referred to collectively as the "Service."

## III.     LEGAL FRAMEWORK

## A.     The Endangered Species Act

### Listing of Threatened or Endangered Species

24.     Before a species receives full protection under the ESA, the Service must list it as "threatened" or "endangered."  A threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(20).  An endangered species is one "which is in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  The Service is required to make its listing determinations based on certain factors using the "best scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A).

### Critical Habitat Designation

25.     Under section 4 of the ESA, when the Service lists a species as threatened or endangered, the ESA imposes a concurrent duty on the Service to specify "to the maximum extent prudent and determinable" critical habitat for that listed species.  16 U.S.C. § 1533(a)(3).  ESA section 3(5)(A) defines critical habitat as "the specific areas within the geographical area occupied by the species, at the time it is listed . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management consideration or protection."  16 U.S.C. § 1532(5)(A)(i).  In addition, the Secretary

may designate "specific areas outside the geographical area occupied by the species at the time it is listed . . . upon a determination by the Secretary that such areas are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). "Except in those circumstances determined by the Secretary, critical habitat shall not include the entire geographical area which can be occupied by the threatened or endangered species." 16 U.S.C. § 1532(5)(C).

26.     The Secretary must designate critical habitat "on the basis of the best scientific data available and after taking into consideration the economic impact, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2).

27.     The Secretary "may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned." 16 U.S.C. § 1533(b)(2).

## B.     The National Environmental Policy Act

28.     NEPA requires that federal agencies undertake a process designed to ensure that the federal government makes informed decisions based on the due consideration of a full range of consequences and alternatives.  Towards these ends, NEPA requires all federal agencies to prepare an Environmental Impact Statement ("EIS") for every recommendation or report on proposals for legislation and other

major federal actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA implementing regulations provide agencies with the option of preparing an Environmental Assessment ("EA"), which either determines that an EIS is required, or culminates in a Finding of No Significant Impact, thereby terminating the agency's NEPA obligations.

29.     Courts have ruled that federal agencies have a duty under NEPA to use the "Hard Look Doctrine" in making decisions that have environmental consequences. See Marsh v. Ore. Natural Res. Council, 490 U.S. 360, 371 (1989) ("NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct"). As a result, NEPA documents are judicially reviewed for completeness of information and detail, among other things. To make a sound judgment, an agency must have and use the best information possible.

30.     In the prior CHAPA litigation, the court severely criticized the Service for not complying with NEPA, reminding the agency that "partial fulfillment of NEPA's requirements is not enough," and that NEPA calls for compliance "to the fullest extent possible." CHAPA, 344 F.Supp. 2d at 135.

## C.     The Administrative Procedure Act

31.     Pursuant to the APA, a court must set aside agency action when (a) the agency action fails to meet statutory, procedural or constitutional requirements; or (b) it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. See 5 U.S.C. § 706(2)(A)-(D).

12

32.     Section 704 of the APA states that "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy at law are subject to judicial review." 5 U.S.C. § 704.  The October 21, 2008 critical habitat designation at issue here meets the requirement of final agency action subject to review.

## V.    FACTUAL ALLEGATIONS

### A.    The Final Rule

33.     The piping plover (*Charadrius melodus*) is a small, sand-colored North American shorebird that has orange legs and two dark bands across its neck and forehead.  Plovers breed in three discrete areas of North America:  the Northern Great Plains, the Great Lakes and the Atlantic Coast.  The Atlantic Coast Plover population breeds on coastal beaches from Newfoundland to North Carolina.  The Great Plains birds make their nests on open, sparsely vegetated sand or gravel beaches adjacent to alkali wetlands, and on beaches, sand bars, and dredged material islands of major river systems.  Great Lakes Plovers breed on sparsely vegetated beaches, cobble pans, or sand spits of sand dune ecosystems along the Great Lakes shorelines.  Plovers from all three breeding populations winter along Atlantic Coast from North Carolina south, along the Gulf Coast, and also in the Caribbean.  The highest concentration of wintering plovers (89 percent) is found on the Gulf Coast beaches of Texas, Louisiana and Florida.  The beaches of North Carolina are, therefore, not the primary wintering grounds for this species.

13

34.    In 1985, the Service designated the Great Lakes population of the plover as endangered and the Atlantic Coast and Great Plains populations as threatened. See 50 Fed. Reg. 50,720 (Oct. 4, 2001). The Service also considers plovers threatened within their wintering range. In 1996, the Service was sued by Defenders of Wildlife for the Service's failure to designate critical habitat for the Great Lakes population. A second suit related to the Great Plains population was filed in 1997. In 2000, the Service settled with Defenders. The consent decree ordered the following: "critical habitat designation for the Great Lakes Plover shall be completed by April 30, 2001, and the final rule for the designation of critical habitat for the Northern Great Plains Plover shall be completed by March 15, 2002." Defenders of Wildlife v. Babbitt, (Consolidated cases, Civil No. 1:96-CV-02695 AER and Civil No. 1:97-CV00771AER). While not ordered to do so, the Service decided to also designate critical habitat for wintering populations, claiming that it could not distinguish between the wintering habitat of the two populations.

35.    On July 6, 2000, the Service published its proposed rule for designating critical habitat for the "wintering populations" of plover. 65 Fed. Reg. 41,782. The proposed rule sought to designate over 2,100,000 acres of private and public property over a span of 1,672 linear miles of coastline from North Carolina to Texas. CHAPA, OBPA, and coastal communities from North Carolina were part of a coalition that sent detailed comments to the Service, expressing concern regarding the paucity of data and analysis to support the scope of the proposed designation.

14

This coalition urged the Service to reconsider the scope of the proposal, noting that it would have a severe impact on the economy of the Outer Banks area.

36.    Following a July 17, 2000 public meeting in Wilmington, North Carolina, the Service published a response to comments raised at the meeting.  In that document, the Service acknowledged that "many beaches in North Carolina are owned and managed by the National Park Service." See U.S. Fish & Wildlife Service, *Piping Plover Critical Habitat Designation Public Meeting,* (July 17, 2000). The Service further stated that "[t]hus far, the Park Service has been able to adequately protect their listed species, including the Plover, while accommodating public recreation of all kinds on the beaches." Id. Citing the NPS's management of plover sites via temporary closures, the Service stated that "[t]his history of successful mutual use shows that it is certainly possible for rare beach species to survive while people enjoy the beaches." Id. The Service also stated that while the NPS "has final say over how their property is managed" they "cannot implement activities which may . . . adversely modify critical habitat." Id.

37.    Despite the extensive comments it received urging it to rethink its analysis, the Service, on July 10, 2001, published the final rule designating critical habitat for wintering populations of the plover.  66 Fed. Reg. 36,038.

38.    CHAPA sued for many of the same reasons it is suing now, as listed in ¶ 5, above.  On November 1, 2004, the CHAPA Court granted Plaintiffs' motion for Summary Judgment, finding major violations of the ESA, NEPA, and the APA;

vacated the critical habitat designation of units NC-1, -2, -4, and -5; and remanded the rule to the Service.  CHAPA, 344 F.Supp. 2d at 137.

39.     On remand, the Service essentially "repackaged" its proposed critical habitat for these four areas and did not adequately address the serious violations of law found by the CHAPA Court.  72 Fed. Reg. 30,326 (May 31, 2007) and 73 Fed. Reg. 28,084 (May 15, 2008).  Despite the extensive comments submitted by CHAPA, the counties, and others, the October 21, 2008 Final Rule made no significant changes in the North Carolina designation.  In fact, the acreage of the four units increased from 1,827 to 2,043 acres.  Final Rule at 62,816.

## B.     Defects of the Final Rule

Failure to Exclude Cape Hatteras National Seashore

40.     Pursuant to ESA section 4, the Service has a statutory obligation to utilize the "best scientific data available . . . after taking into consideration the economic impact, and any other relevant impact, of specifying any particular area as critical habitat."  16 U.S.C. § 1533(b)(2).  The Secretary may exclude any area from critical habitat "if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as critical habitat."  Id.

41.     Furthermore, the Service has  recognized that critical habitat designation requires additional regulatory review that may "undermine conservation efforts and partnerships designed to proactively protect species to ensure that listing under the Act will not be necessary."  Clarification of the Economic and Non-Economic Exclusions for the Final Designation of Critical

Habitat for Four Vernal Pool Crustaceans and Eleven Vernal Pool Plants in California and Southern Oregon, 72 Fed. Reg. 30,270, 30,283 (May 31, 2007).

42.     The Service also considers a management plan to provide adequate protection to species,  making critical habitat designation unnecessary, if it meets three criteria:

> (1) The plan is complete and provides a conservation benefit to the species (i.e., the plan must maintain or provide for an increase in the species' population, or the enhancement or restoration of its habitat within the area covered by the plan); (2) the plan provides assurances that the conservation management strategies and actions will be implemented (i.e., those responsible for implementing the plan are capable of accomplishing the objectives, and have an implementation schedule or adequate funding for implementing the management plan); and (3) the plan provides assurances that the conservation strategies and measures will be effective (i.e., it identifies biological goals, has provisions for reporting progress, and is of a duration sufficient to implement the plan and achieve the plan's goals and objectives).

See Amended Designation of Critical Habitat for the Winter Population of Piping Plover, 71 Fed. Reg. 33,703, 33,712-13 (June 12, 2006).

43.     Here, in the Final Rule, the Service failed to apply these factors to the plan in place at Cape Hatteras and simply relied on Ctr. for Biological Diversity v. Norton ("CBD"), 240 F. Supp 2d 1090 (D. Ariz. 2003)—concluding that "if a habitat is already under some sort of management for its conservation, that particular habitat required special management considerations or protection and, therefore meets the definition of critical habitat." 73 Fed. Reg. at 62,817.  This finding is faulty because it ignores the service's own criteria for analyzing non-economic

17

impacts regarding the adequacy of existing management plans.  In fact, the Final

Rule's non-economic exclusion analysis makes no mention of these factors.  73 Fed.

Reg. at 62833-62834.  The Service's arbitrary interpretation contrasts with other

cases where the Service conducted the required analysis and found that the

relevant federal agency could manage lands in question to provide protections for

the species to make designation of critical habitat unnecessary.  In fact, in the

original 2001 designation, the Service excluded the Padre Island National Seashore

in Texas because its Seashore General Management Plan and a Final Oil and Gas

Management Plan "provided adequate management and conservation of the Plover

within the Seashore."  66 Fed. Reg. at 36,082 (Col. 1-2).  The Service has even

excluded an area based on a draft management plan.  Id. at *30.  See also, 72 Fed.

Reg. 30,270.  Courts have upheld the Service's exclusion of state and federal lands

from critical habitat designation based on Service findings of the adequacy of an

existing land management plan.  See Home Builders Ass'n of N. Cal. v. U.S. Fish

and Wildlife Serv., No. CIV. S-05-0629, 2006 WL 3190518, at *29 (E.D. Cal. Nov. 2,

2006).

　　44.　　Here, the Seashore is governed by an existing NPS management plan.

See FONSI/Interim Protected Species Management Strategy ("Interim Plan")(July

2007).  The Seashore's own Superintendent Mike Murray requested exclusion from

critical habitat designation, detailing the specific measures already in place that

benefit the wintering plover population (year-round closures, monitoring,

information generation for the public, and so forth).  Letter from Murray to the

Service (July 30, 2007)(Exhibit D). The extensive protections for the piping plover

provided by the Interim Plan were increased by an April 30, 2008 consent decree.

Defenders of Wildlife v. Nat'l Park Serv., No. 2:07-CV-45-BO at 3-4 (E.D.N.C. Apr.

30, 2008) ("Consent Decree"). The Interim Plan incorporated measures set out in a

2007 Biological Opinion issued by the Service. That plan has been in place for more

than a year and a half and has successfully protected the plover population while

the NPS develops a long-term management plan. Interim Plan at 2, 4, 13.

45.    Plaintiffs submit that if the Service had conducted an analysis of the

Seashore's plan under its own three criteria, it would have excluded these areas

from critical habitat designation.

The Service's Economic Analysis Is Legally Deficient

46.    The Service's economic analysis demonstrates a fundamental

misunderstanding of the true impacts of the designation. In comments submitted

by Plaintiffs and by several individual entities (including OBPA), the Service was

made aware that Outer Banks government and businesses rely on tourism as their

economic base—and that this tourism, in turn, is dependent on access to public

beaches. Plaintiffs have long and consistently expressed concern that the additional

scrutiny from the plover critical habitat designation will fundamentally affect

access to the beaches of the Seashore. User groups, as well as many businesses, will

suffer if the designation leads to substantial limits or to an outright ban on

motorized and pedestrian use within these areas. Ultimately, the Final Rule could

devastate the entire coastal economy and its tax base that is directly affected by access to Outer Bank beaches.

47.    The historic villages at the Seashore have prospered due to, and are largely dependent on, the livelihood provided by the free and open motorized and pedestrian beach access traditionally afforded them.  Because of the distances involved, most recreational users, and commercial fishermen must use motorized means to access Seashore beaches.  More recently, for recreational users, the use of vehicles renders more beach areas accessible and lessens the impact of beach use overall.  Additionally, such access provides personal mobility for senior citizens and the disabled and thus expands their opportunity to enjoy many of the same activities as the fully able-bodied.  Vehicular beach access also extends the tourist season, which forms the "backbone" of the Islands' economies.

48.    The Seashore is at the northern edge of the wintering habitat for the Great Lakes, Great Plains and Atlantic Plover populations.  Correspondingly, not many piping plovers winter there—only 10, for example, were observed there in December, 2007.  Despite this low plover population, NPS has implemented an Interim Plan that includes temporary beach closures to protect shore birds (plovers, terns, black skimmers, and American oystercatchers) and endangered sea turtle nests.  No entry is allowed in these closures, either by foot or vehicle.  In addition, seasonal closures protect beaches in front of highly populated areas.  On April 30, 2008, the U.S. District Court for the Eastern District of North Carolina entered a Consent Decree whereby the NPS expanded the scope of areas that are subject to

temporary or permanent closures. Defenders of Wildlife v. Nat'l Park Serv., No. 2:07-CV-45-BO at 3-4 (E.D.N.C. Apr. 30, 2008). These additional closures have drastically reduced the total beach-miles available to the public, creating crowded conditions at the remaining areas.

49. Plaintiffs submit that designation of critical habitat could very well lead NPS to restrict motorized and pedestrian access to certain areas which could have a profound impact on the area's tourist based economy. If critical habitat restricted areas are added to the beach areas that are already closed due to other management issues including the April 30, 2008 Consent Decree, little beach will be left for the public to enjoy. This will cause overcrowding at the few remaining public beach areas, strain the Seashore's resources that may still be accessed, and increase the potential for user conflict. It will also clog the public beaches of Plaintiffs Dare and Hyde Counties and their municipalities which also allow for motorized and pedestrian access, and impair the County governments' ability to provide necessary services because of reduced tax revenues. Eventually, the prime reason people come to the Seashore—surf fishing and recreation at aesthetically pleasing beaches— could force visitors to go elsewhere. This flight would have a devastating impact on all entities that are dependent upon the tourist industry for their livelihood. Indeed, many businesses have already felt the "chilling effect" of the additional closures under the April 30 2008 Consent Decree.

Failure to Describe How the Primary Constituent Elements Need Protection

50.     With a narrow exception, critical habitat is limited to "specific areas within the geographical area occupied by the species, at the time that it is listed" which have certain physical or biological features.  16 U.S.C. § 1532(5)(A)(i).

51.     The Service did not directly address the CHAPA Court's statement regarding primary constituent elements, or "PCEs."  The Court stated that "the crystal clear statutory requirement that PCEs must be those that may require special management considerations or protection . . . Rather than discuss how each identified PCE would need management or protection, the [Service] lists activities that once resulted in consultations and makes a conclusory statement that dredging or shoreline management could result in permanent habitat loss.  This does not meet the [Service's] burden."  CHAPA, 344 F.Supp.2d at 124.

52.     The 2008 Final Rule is nonetheless based on conclusory statements that certain activities, usually off-road vehicle use, will require special management considerations.  The Final Rule in reality did little more than list activities that threaten critical habitat.  Such global issue identification is not enough.  Therefore, the Final Rule fails to meet the CHAPA Court's direction that the Service provide an analysis of why and how management procedures would lessen harm from these activities.

## C.    NEPA Compliance

53.     The Service prepared an EA and FONSI in response to the CHAPA Court's order.  However, the Service still has not complied with NEPA for a number

of reasons. First, the EA/FONSI relied upon a Final Economic Analysis ("FEA") that was dependent on the flawed "Vogelsong Study"—a study that, according to peer reviewers, did not "appear to provide a sound scientific basis for estimating" off-road vehicle use at the Seashore. FEA at 2-14. The FEA's wide uncertainty—ranging in the many millions of dollars—reflects in part the economic analysis's over-reliance on the discredited Vogelsong Study and the assumption that the possible closures and restrictions on designated units will not exceed closures and restrictions under the NPS's Interim Plan. Second, the Vogelsong Study was summarily approved over a study submitted by CHAPA (the "Neal Study"). With no explanation as to why Vogelsong's work is superior to the Neal Study, it cannot be said that Vogelsong represents the best available science. Third, the EA/FONSI is not supported by an adequate cost-benefit analysis. That analysis is at best "less useful" or even "misleading." See Office of Management and Budget, Guidelines and Discount Rates for Benefit-Cost Analysis of Federal Programs, Circular No. A-94 at 10 (Oct. 29, 1992), *available at*

http://www.whitehouse.gov/omb/circulars/a094/a094.html.

54.     Furthermore, the FEA does not meet the CHAPA Court's concern that the earlier economic analysis did not consider all the potential costs of the designation—the FEA did not discuss "the effects of the designation on everyone who might be affected." CHAPA, 344 F.Supp.2d at 132. The FEA did not gather any "hard" data on the ground from local businesses and entities like the Outer Banks Visitors Bureau, and thus failed to provide the "comprehensive" study the

Court required.  See Final Rule at 62824 ("A survey regarding the specific potential effects of management closures on individual businesses is beyond the scope of this analysis").

55.     The EA/FONSI also lacks sufficient scientific information regarding the piping plover and its habitat.  The Service did not apply credible science to support analysis of the piping plover wintering population on the Outer Banks and its relation to piping plover populations throughout the nation.  Nor did the EA/FONSI analyze or discuss piping plover population changes since the bird was first listed as endangered in the late 1980s as presented in comments submitted by CHAPA's consultant.

## VI. CLAIMS FOR RELIEF

### COUNT I – THE SERVICE VIOLATED THE ESA AND THE APA BY ARBITRARILY (1) DETERMINING THAT THE UNITS IN THE CAPE HATTERAS NATIONAL SEASHORE MEET THE DEFINITION OF CRITICAL HABITAT BECAUSE THEY ARE UNDER AN EXISTING MANAGEMENT PLAN, AND (2) FAILING TO  CONDUCT AN ANALYSIS  OF THAT PLAN UNDER THE SERVICE'S EXCLUSION CRITERIA

56.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 55 of the Complaint as fully set forth therein.

57.     Subsection 4(b)(2) of the ESA allows the Service to exclude areas from critical habitat designation where the benefits of exclusion outweigh the benefits of designation, provided the exclusion will not result in the extinction of the species.

58.     The Service has set out three factors for considering whether an existing management plan provides adequate protection for the species to justify exclusion under section 4(b)(2).  72 Fed. Reg. at 30,283.  See also, ¶ 42, *supra*.

59.     The Service failed to conduct an analysis of the Service's 2007 Interim Management Plan in place for the Seashore, improperly concluding that "if a habitat is already under some sort of management for its conservation, that particular habitat required special management considerations or protection and, therefore, meets the definition of critical habitat."  73 Fed. Reg. at 62,817.  In fact, the Final Rule's non-economic exclusion analysis does not mention the factors as applied to the Plan.  73 Fed. Reg. at 62,832-33.  The Service's reliance on a faulty theory—that the existence of a management plan means that the area meets the definition of critical habitat—and its failure to conduct an analysis of the adequacy of the Interim Plan under its exclusion criteria, was arbitrary and capricious and an abuse of discretion in violation of the ESA and the APA, 5 U.S.C. § 706.

## COUNT II – THE SERVICE VIOLATED THE ESA AND THE APA BY FAILING TO ADEQUATELY EVALUATE THE ECONOMIC IMPACTS OF THE DESIGNATION

60.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 59 of the Complaint as fully set forth herein.

61.     Section 4(b)(2) of the ESA imposes on the Service a duty to designate critical habitat only "after taking into consideration the economic impact, and any other relevant impact, of specifying any particular area as critical habitat."  The Service has failed to comply with this mandate in its critical habitat designation.

62.     In its EA, the Service concluded that the approval of the new critical habitat areas will have minimal economic impact.  That finding was arbitrary and capricious in that (1) it relied on the flawed "Vogelsong Study" that was discredited by peer reviewers and (2) did not remedy the defects in the prior economic by again failing to address "the effects of the designation on everyone who might be affected." CHAPA, 344 F. Supp. 2d at 132.  As such, the Service did not adequately address the significant economic impact that the critical habitat designation will have upon the economy of the communities surrounding and within the Seashore.

63.     By failing to adequately evaluate the economic impacts of the critical habitat designation, the Service violated the ESA.  The designation of critical habitat for the plover without adequate consideration of economic or other relevant impacts was, therefore, arbitrary and capricious, and abuse of discretion, or otherwise not in accordance with law in violation of the APA, 5 U.S.C. § 706.

**COUNT III – THE SERVICE VIOLATED THE CRITICAL HABITAT DESIGNATION CRITERIA UNDER THE ESA AND THE APA BY NOT SPECIFYING HOW EACH IDENTIFIED PRIMARY CONSTITUENT ELEMENT REQUIRES SPECIAL MANAGEMENT CONSIDERATIONS OR PROTECTION**

64.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 63 of the Complaint as fully set forth herein.

65.     The ESA requires the Secretary to limit critical habitat to those "specific areas in the geographical area occupied by the species, at the time it is listed" which contain "those physical or biological features . . . essential to the conservation of the species and . . . which may require special management

considerations or protection." 16 U.S.C. § 1532(5). Areas outside those occupied areas may be included upon a determination that "such areas are essential for the conservation of the species." Id. Except as determined by the Secretary, critical habitat shall not include the entire geographical area which can be occupied by the protected species.

66.    The Service did not comply with these legal requirements when it designated critical habitat for the plover by just listing activities that threaten plover habitat without specifying and discussing how each identified Primary Constituent Element would need special management protection. The designation of critical habitat for the plover was, therefore, arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law and in violation of the APA, 5 U.S.C. § 706.

### COUNT IV –THE SERVICE'S DETERMINATION THAT AN ENVIRONMENTAL IMPACT STATEMENT WAS NOT REQUIRED UNDER NEPA WAS BASED ON AN INADEQUATE AND FLAWED ENVIRONMENTAL ASSESSMENT

67.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 66 of the Complaint as fully set forth herein.

68.    Under Section 102(2)(c) of NEPA, whenever an agency proposes a "major federal action" that will significantly impact the environment, the Service is required to issue a detailed statement addressing the environmental impact of the project as well as any alternatives. This process requires use of the best available science.

69.     In its EA/FONSI, the Service wrongfully determined that no EIS was required. This decision was legally deficient because it was based on an inadequate and flawed Environmental Assessment. By failing to prepare an adequate EA, the Service violated NEPA's important procedural requirements, greatly injuring Plaintiffs. Therefore, the Service's designation of critical habitat without complying with NEPA was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law in violation of the APA, 5 U.S.C. § 706.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court to:

1.      Declare that the Final Rule designating critical habitat for the plover was promulgated in violation of the Endangered Species Act and Administrative Procedure Act, and is therefore invalid;

2.      Declare that the Final Rule violates the National Environmental Policy Act and the Administrative Procedure Act;

3.      Enjoin the Service from enforcing or otherwise implementing the Final Rule;

4.      Vacate the Final Rule and remand to the Secretary with directions to correct violations of law;

5.      Award Plaintiffs attorney's fees and costs to the extent permitted by law; and

6.      Grant such other relief as the Court shall deem just and proper.

Respectfully submitted,

HOLLAND & KNIGHT LLP

BY: _Lawrence R. Liebesman_

Lawrence R. Liebesman(Bar #193086)
Rafe Petersen (Bar #465542)
2099 Pennsylvania Ave., N.W.
Washington, DC  20006
(202) 955-3000

Attorneys for Plaintiffs

_2/6/09_
Date

# 5850879_v4