**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| THE CAPE HATTERAS ACCESS PRESERVATION ALLIANCE, *et al.*, | ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| | )    **Civil Action No. 09-0236 (RCL)** |
| v. | ) |
| | ) |
| U.S. DEPARTMENT OF THE INTERIOR, *et al.*, | ) ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| DEFENDERS OF WILDLIFE, *et al.*, | ) |
| | ) |
| Defendant-Intervenors. | ) |

_____)

## MEMORANDUM OPINION

### I.    Introduction

This case concerns environmental regulations designating critical habitat for the piping plover, a small shorebird. On October 21, 2008, defendants, the Department of the Interior and its Fish and Wildlife Service (collectively "the Service") published a final rule designating critical habitat for the wintering piping plover in North Carolina pursuant to the Endangered Species Act (ESA). The Service revised its critical habitat designation for the units after this Court vacated the Service's original designation in 2001. *See Cape Hatteras Access Pres. Alliance v. U.S. Dep't of the Interior*, 344 F. Supp. 2d 108 (D.D.C. 2004) (*CHAPA I*). The revised designation includes approximately 2,053 acres in Dare and Hyde Counties, North Carolina and consists of four habitat units.

Plaintiffs challenge the revised critical habitat designations under the ESA and the National Environmental Policy Act (NEPA). Plaintiffs allege that the Service's revised designation fails to satisfy the Court's remand order in *CHAPA I*. Specifically, plaintiffs argue that the revised critical habitat designation (1) fails to address the statutory requirement that Primary Constituent Elements (PCE's) must be those that may require special management considerations; (2) improperly relied on a district court decision holding that if a habitat is already under some sort of management for its conservation, that particular habitat meets the definition of critical habitat; (3) fails to adequately consider other relevant information, including a 2007 off-road vehicle plan; and (4) fails to adequately consider the economic impacts of the designation. Finally, plaintiffs argue that the Service's Environmental Assessment (EA) and Finding of No Significant Impact pursuant to NEPA are inadequate.

Upon consideration of the parties' cross motions for summary judgment, the oppositions and replies thereto, the administrative record, and for the reasons set for in this Memorandum Opinion, plaintiffs' motion for summary judgment will be denied. Accordingly, the government defendants' cross-motion for summary judgment will be granted and intervening defendants' cross-motion for summary judgment will be granted.

## II. Factual and Procedural Background
### a. The Piping Plover

The North Carolina coast is home to the piping plover, a small North American shorebird that "blends in well with beaches and sand flats, part of its primary habitat." 66 Fed. Reg. 36,038-36,143 (July 10, 2001). It nests and roosts directly on sandy beaches and spends much of its time foraging for small marine crustaceans and other prey in the wet and moist areas of beaches such as "mud flats, sand flats, algal flats, and washover passes (areas where banks in the sand dunes result in an inlet)." *Id.* at 36,038. Piping plovers are a migratory species; the

members of all three of its breeding populations winter in coastal areas of the United States from North Carolina to Texas, as well as along the coasts of Mexico and on Caribbean islands. *Id.* In North America, the piping plover breeds in three geographic regions. The threatened Atlantic Coast population breeds on sandy beaches along the East Coast from Newfoundland to North Carolina. 66 Fed. Reg. at 36,038; *see also* 67 Fed. Reg. 57,638 (Sept. 11, 2002). "Piping plovers begin arriving on the wintering grounds in July, with some late-nesting birds arriving in September." *Id.* They begin leaving the wintering grounds to migrate back to breeding sites in late February, "and by late May most birds have left the wintering grounds." *Id.* at 36,039. Piping plovers spend up to 10 months of each year on the wintering grounds. *Id.* at 36,043. The piping plover can be observed in North Carolina every month of the year, and all three geographic populations of piping plovers are known to use the North Carolina coastline during the non-breeding season. AR 345 at 13-14, 86, 129-30, 211-12.

### b. Plaintiffs' Interests

Plaintiff Cape Hatteras Access Preservation Alliance (CHAPA) is a coalition established for the purpose of "preserving and protecting a lifestyle and way of life historically prevalent on the Outer Banks of North Carolina." Pls.' Mot. Summ. J. 4. CHAPA members regularly operate off-road vehicles for both recreational and commercial purposes. Off-road vehicles provide recreational access to seashore beaches that is essential for the area's tourism-based economy. CHAPA's members are concerned that the Service's critical habitat designation will lead to substantial limits, or an outright ban, on off-road vehicle use within certain areas of the Cape Hatteras Seashore.

Plaintiffs Dare County and Hyde County are counties within the Outer Banks of North Carolina. Dare County encompasses seven of the seashore's eight unincorporated villages and

six municipalities, Duck, Kill Devil Hills, Kitty Hawk, Manteo, Nags Head, and Southern Shores. While the county's permanent population is 29,000, the county's average daily population during the summer months ranges from 225,000 to 275,000. Dare County's 2001 revenue from tourism was over $365 million. Plaintiff Hyde County, home to only 5,500 people, includes the Ocracoke Island portion of the Outer Banks of North Carolina. The island depends on tourism, which generated $24 million in 2001.

### c.   The Service's Critical Habitat Designation

The Service first published its critical habitat designation for the piping plover in 2001. The designation came nearly 16 years after the Service published its final rule pursuant to the ESA listing the plover as endangered in the Great Lakes watershed and threatened in the remainder of its range, including on its migratory routes and its wintering grounds, where the plover spends up to 10 months each year. *CHAPA I*, 344 F. Supp. at 115 (citing Determination of Endangered and Threatened Status for the Piping Plover, 50 Fed.Reg. 50,726 (Dec. 11, 1985)). Back in 1985, the Service declined to designate any critical habitat for the plover. In 1996, the Defenders of Wildlife filed suit to compel critical habitat designation for the Great Lakes and Northern Great Plains populations of piping plovers. In 2000, the Court ordered the Service to carry out these designations. *CHAPA I*, 344 F. Supp. 2d at 115 (citing *Defenders of Wildlife v. Babbitt*, Nos. 96-CV-2695, 97-CV-777 (D.D.C Feb. 8, 2000)).

After the Service published its original final rule designating critical habitat for wintering piping plovers in 137 coastal areas, including 18 areas in North Carolina in 2001, plaintiffs filed suit challenging the designation of four units of critical habitat in the Outer Banks of North Carolina.  In 2004, the Court remanded to the Service the 2001 designation of the four units. *CHAPA I*, 344 F. Supp. 2d 108. The Court identified six errors or needs for clarification under

the ESA and one error under NEPA. The Court found that (1) the Service failed to show that PCEs are found on all of the areas it designated as critical habitat; (2) the Service failed to analyze whether PCEs may require special management considerations or protections; (3) the Service must clarify its economic analysis, specifically its functional equivalence policy; (4) the Service must identify baseline costs in its economic analysis; (5) the Service's conclusions regarding off-road vehicles were arbitrary and capricious; (6) the Service must address consultation costs in its economic analysis; and (7) the Service erred by failing to complete an EA pursuant to NEPA.

In response to the Court's order in *CHAPA I*, the Service published a proposed rule re-designating portions of each of the four areas as critical habitat on June 12, 2006. 71 Fed. Reg. 33,703. On May 31, 2007, the Service announced the availability of a draft economic analysis and environmental assessment for the June 12, 2006 proposed rule. 72 Fed. Reg. 30,326. On May 15, 2008, the Service announced revisions to the proposed critical habitats to include several islands to one of the four units. 73 Fed. Reg. 28,084.

Meanwhile, environmental groups filed suit in the United States District Court for the Eastern District of North Carolina, alleging that the National Park Service (NPS) failed to promulgate a final regulation to manage off-road vehicle use at Cape Hatteras in violation of the ESA, two presidential executive orders, NPS regulations and the Migratory Bird Treaty Act. *Defenders of Wildlife v. Nat'l Park Serv.*, No. 07-cv-45 (E.D.N.C.). The plaintiffs in the present lawsuit intervened in that lawsuit. The court approved a Consent Decree, which requires NPS to publish a final off-road vehicle management plan by April 1, 2011. Until then, NPS may continue off-road vehicle management derived in an Interim Plan.

The Service published its final revised critical habitat designation on October 21, 2008. 73 Fed. Reg. 62,815. The rule designates 2,043 acres of North Carolina shoreline, primarily located within the Cape Hatteras National Seashore. The revised final designation contains approximately 1,573 fewer acres than the original 2001 designation and no private land is included in the revised designation. On February 6, 2009, plaintiffs filed a Complaint for Declaratory and Injunctive Relief against the U.S. Department of Interior and the Service. Defenders of Wildlife and the National Audubon Society intervened in the lawsuit on the side of the federal defendants. Currently before the Court are plaintiffs' motion for summary judgment, and federal defendants and defendant-intervenors' cross motions for summary judgment.

### III.   Standing

Federal defendants and defendant-intervenors assert that plaintiffs lack standing to bring this suit. To establish standing, plaintiffs must establish that they meet certain constitutional and prudential requirements. "The 'irreducible constitutional minimum of standing contains three elements: (1) injury-in-fact, (2) causation, and (3) redressability." *Jackson County, N.C. v. FERC*, 589 F.3d 1284, 1288 (D.C. Cir. 2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)) (internal quotation omitted). Thus, to demonstrate constitutional standing, "a petitioner must allege (1) a personal injury-in-fact that is (2) fairly traceable to the defendant's conduct and (3) redressable by the relief requested." *Int'l Bhd. of Teamsters v. Trans. Security Admin.*, 429 F.3d 1130, 1134 (D.C. Cir. 2005).

In order to establish prudential standing, plaintiffs must demonstrate that the injury "arguably falls within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett v. Spear*, 520 U.S. 154, 162 (1997). The requirement that the interests of plaintiffs fall within the zone of interests protected or regulated by the statutes at issue is "not meant to be especially demanding" and does not require that a

particular plaintiff be the intended beneficiary of the act. *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399-400 (1987). The test excludes only plaintiffs whose interests are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* The focus is "not on those who Congress intended to benefit, but on those who in practice can be expected to police the interests that the statute protects." *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1075 (D.C. Cir. 1998).

Here, plaintiffs have demonstrated both constitutional and prudential standing. As in *CHAPA I*, CHAPA members fear that the Service's administration of the critical habitat will result in use restrictions on vehicles and closure of beaches of access portions. This not only affects recreation but the livelihood of local fisherman who are dependent on the vehicles. The regulations could also impact tourism, which would have a severe impact on local business, many of which derive substantial revenue from tourism. Similarly, the counties assert harm related to their tourism economy and their ability to maintain and repair infrastructure and seashore. These injuries are causally related to the Service's critical habitat designation. Additionally, the Court can require the Service to revisit, again, its designation. Additionally, the Supreme Court recently held that "[a] party that obtains a judgment in its favor acquires a 'judicially cognizable' interest in ensuring compliance with that judgment." *Salazar v. Buono*, 130 S. Ct. 1803, 1814-15 (2010) (citing *Allen v. Wright*, 408 U.S. 737, 763 (1984)). Here, the plaintiffs obtained a judgment in their favor in *CHAPA I* and are seeking judicial review challenging whether the Service complied with the remand order. Therefore, plaintiffs have demonstrated constitutional standing.

Similarly, plaintiffs have established prudential standing. Plaintiffs acquire prudential standing in relation to their ESA claims pursuant to the citizen-suit provision of the ESA. *See*

Bennett, 520 U.S. at 162. In *Bennett v. Spear,* the Supreme Court held that the broad language of the citizen-suit provision of the ESA "negates the zone-of-interests test" and expands standing "to the full extent permitted under Article III." 520 U.S. 154, 164 (1997). Additionally, plaintiffs have established that their injuries fall within the zone of interests regulated by the statutory provision invoked in the suit. CHAPA's assertion of future recreational harms are within the zone of interests protected by the statute. *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1236 (D.C. Cir. 1996) (noting that even those not "pure of heart" can assert, under NEPA, aesthetic and environmental interests in the quality of public lands for activities such as camping, hiking, and fishing). Similarly, the Counties' assertions of harms they suffered in relation to repair of area beaches and harms to the quality of life of residents related to the physical environment, *see Hanly v. Mitchell*, 460 F.2d 640 (2d Cir. 1972) are sufficient to fall within the zone of interests.[1]

## IV.    Standard of Review

Generally, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting

---

[1] As in *CHAPA I*, the Court notes that for each claim, if constitutional and prudential standing can be shown for at least one plaintiff, standing may extend to all plaintiffs, and the Court need not consider the standing of the other plaintiffs to raise that claim. *CHAPA I*, 344 F. Supp. 2d at 118 n.2 (citing *Mountain States Legal Found.*, 92 F.3d at 1232.

forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *see Celotex Corp.*, 477 U.S. at 324.

However, a federal agency's compliance with its statutory and regulatory obligations is subject to the Administrative Procedure Act (APA). The APA creates a cause of action for challenges to final agency decisions, findings or conclusions alleged to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). While the court's review must be "searching and careful, the ultimate standard of review is a narrow one" and the court "is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). The standard is deferential in order to guard against "undue judicial interference" with the lawful exercise of agency discretion and prevents "judicial entanglement in abstract policy disagreements which courts lack both the expertise and information to resolve. *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 66 (2004).

In applying this standard, an action will be set aside if the agency identified no "rational connection between the facts found and the choice made," if the "explanation for its decision [is] counter to the evidence before the agency, or is so implausible that is could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Under the APA's standard of review, there is a presumption of validity of agency action. *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976) (en banc). In other words, so long as the agency considered the relevant factors and articulated an explanation establishing a rational connection between the facts found and the choice made, the court will not substitute its judgment for that of the agency. *See CHAPA I*, 344 F. Supp. 2d. at 119 (citing *Wyo. Outdoor Council v. Bosworth*, 284 F. Supp. 2d 81, 89 (D.D.C. 2003).

# V.     ESA Critical Habitat Designation

The Endangered Species Act is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). The ESA was enacted to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The ESA defines the terms "conserve" and "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the Act] are no longer necessary." *Id.* at 1532(3). In other words, as noted by the Fifth Circuit, the objective of the ESA "is to enable listed species not merely to survive, but to recover from their endangered or threatened status." *Sierra Club v. United States Fish and Wildlife Serv.*, 245 F.3d 434, 438 (5th Cir. 2001).

The ESA makes the Secretaries of Commerce and of the Interior responsible for administering and enforcing the Act. The Secretary of the Interior is responsible for terrestrial and freshwater fish species, while the Secretary of Commerce is responsible for marine species. The Secretary of the Interior has delegated the responsibility for terrestrial species to the Service. *Fisher v. Salazar*, 656 F. Supp. 2d 1357, 1358 (N.D. Fla. 2009).

The ESA requires the Service to maintain a list of both endangered and threatened species. A species is "endangered" if it is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* at § 1532(20). Determinations as to whether a species should be listed as endangered or threatened must be made "solely on the basis of the best scientific and commercial data

available." *Id.* at § 1533(b)(1)(A). Economic impacts are not factored into the determination to list a species as endangered or threatened.

In creating the ESA, "Congress started from the finding that '[t]he two major causes of extinction are hunting and destruction of natural habitat.'" *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 179 (1978). Of these two threats, "Congress was informed that the greatest was the destruction of natural habitat." *Id.* Accordingly, the Service is also required to make a determination to designate – "to the maximum extent prudent and determination" – the listed species' critical habitat. *Id.* at § 1533(a)(3)(A). Critical habitats are those lands that are essential to the listed species' conservation. *Id.* § 1532(5)(A). Specifically, critical habitat is defined as:

> (i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

> (ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A). The Service must designate critical habitat "on the basis of the best scientific data available and after taking into consideration the economic impact" of the designation. *Id.* § 1533(b)(2).

A critical habitat designation provides protection for threatened and endangered species by triggering what is termed a Section 7 consultation in response to actions proposed by or with a nexus to a federal agency. *Id.* § 1536(a)(2). Section 7(a)(2) of the ESA requires each federal agency, in consultation with the Service, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of

such species . . . which is . . . critical." *Id.* A Service regulation defines "[j]eopardize" as "an action that reasonably would be expected . . . to reduce appreciably the likelihood of both the survival and recovery of a listed species." 50 C.F.R. § 402.02. The same regulation defines "[d]estruction or adverse modification" as an "alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species." *Id.*

If an agency action may adversely affect a listed species's critical habitat, the action agency and the Service enter into a formal consultation process, at the conclusion of which the Service issues a biological opinion as to the effect of the federal agency action. If the Service concludes that the action will likely result in adverse modification of critical habitat, the Service is required set forth any reasonable and prudent alternatives to the action. *See* 50 C.F.R. § 402.14; 16 U.S.C. § 1536(b)(3)(A).

Once the Service properly determines that a species occupies a candidate area for critical habitat, the Service must then determine that "those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection" are "found" on specific areas within that area. 16 U.S.C. § 1532(5)(A)(i). Such features that satisfy the act's requirements are called Primary Constituent Elements ("PCEs"). *See* 50 C.F.R. § 424.12(b)(5). The agency's regulations help guide the selection of PCEs:

> [T]he Secretary shall focus on the principal biological or physical constituent elements within the defined area that are essential to the conservation of the species. Known primary constituent elements shall be listed with the critical habitat description. Primary constituent elements may include, but are not limited to, the following: roost sites, nesting grounds, spawning sites, feeding sites, seasonal wetland or dryland, water quality or quantity, host species or plant pollinator, geological formation, vegetation type, tide, and specific soil types.

*Id.*

In *CHAPA I*, the Court directed the Service to "show that PCEs are found on the areas it designates as critical habitat." *CHAPA I*, 344 F. Supp. 2d. at 123.

### a. The Service Adequately Considered Specific Management Determinations For Each PCE

In *CHAPA I*, the Court directed the Service to "focus on the management requirements of the area's features, not those requirements of the land merely associated with activities on the land. *CHAPA I*, 344 F. Supp. 2d. at 124. The Court vacated and remanded the four areas of designation because it found that the Service improperly designated areas that did not contain any PCE's that were essential to the conservation of the piping plover. The Court also ordered the Service to clarify its finding that the PCE's as designated require special management or protections. *Id.*

In designating occupied critical habitat, the Service is required to determine that the areas it designates contain PCEs "which may require special management considerations or protection." 16 U.S.C. § 1532(5)(A)(i). The Court explained in *CHAPA I* that "the word 'may indicates that the requirement for special considerations or protections need not be immediate" but must require special consideration or protection "in the future." *CHAPA I*, 344 F. Supp. 2d at 123-24.

Plaintiffs contend that the Service has again failed to meet its clear statutory duty because the unit descriptions are "devoid of any . . . analysis for each PCE." Pls.' Mot. for Summ. J. 17. Unlike the original designation rule, however, the new designation rule adequately discusses special management considerations and protections. The Service undertook a two step process. First, the Service evaluates the lands defined by those physical and biological features that are "essential to the conservation of the species" pursuant to the ESA. The final rule states:

Based on our current knowledge of the life history, biology, and ecology of the species and the requirements of the habitat to sustain the essential life history functions of the species, we have determined that wintering piping plover's PCEs are the habitat components that support foraging, roosting, and sheltering and the physical features necessary for maintaining the natural processes that support these habitat components. The primary constituent elements are:

(1) Intertidal sand beaches (including sand flats) or mud flats (between annual low tide and annual high tide) with no or very sparse emergent vegetation for feeding. In some cases, these flats may be covered or partially covered by a mat of blue-green algae.

(2) Unvegetated or sparsely vegetated sand, mud, or algal flats above annual high tide for roosting. Such sites may have debris or detritus and may have micro-topographic relief (less than 20 in (50 cm) above substrate surface) offering refuge from high winds and cold weather.

(3) Surf-cast algae for feeding.

(4) Sparsely vegetated backbeach, which is the beach area above mean high tide seaward of the dune line, or in cases where no dunes exist, seaward of a delineating feature such as a vegetation line, structure, or road. Backbeach is used by plovers for roosting and refuge during storms.

(5) Spits, especially sand, running into water for foraging and roosting.

(6) Salterns, or bare sand flats in the center of mangrove ecosystems that are found above mean high water and are only irregularly flushed with sea water.

(7) Unvegetated washover areas with little or no topographic relief for feeding and roosting. Washover areas are formed and maintained by the action of hurricanes, storm surges, or other extreme wave actions.

(8) Natural conditions of sparse vegetation and little or no topographic relief mimicked in artificial habitat types (e.g., dredge spoil sites).

73 Fed. Reg. at 62,828.

The PCEs were derived based on the finding that those physical and biological features essential to the conservation of the species that may require special management considerations or protections include (1) space for population growth and normal behavior; (2) food, water, air, light minerals, or other nutritional or physiological requirements; (3) cover or shelter; (4) sites

for breeding, reproduction, and rearing (or development) of offspring; and (5) habitats that are protected from disturbance or are representative of the historical geographical and ecological distributions of a species. *Id.* The final rule also identifies activities that may destroy or adversely modify critical habitat the piping plover including "[d]redging and dredge soil placement, and associated activities including staging of equipment and materials . . . construction of dwellings, roads, marinas and other structures . . . beach nourishment, cleaning, and stabilization . . . certain types of recreational activities, such as vehicular activity that impact the substrate, resulting in reduced prey or disturbance to the species." *Id.* More generally, the rule describes:

> [S]uch activities could eliminate or reduce the habitat necessary for foraging by eliminating or reducing the piping plovers' prey base; destroying or removing available upland habitats necessary for protection of the birds during storms or other harsh environmental conditions; increasing the amount of vegetation to levels that make foraging or roosting habitats unsuitable; increasing recreational activities to such an extent that the amount of available undisturbed foraging or rooting habitat is reduced, with direct or cumulative adverse effects to individuals and completion of their life cycles.

*Id.* at 62,829.

Second, the Service details the reasons why each unit may need special management. The final rule describes the features of each unit and identifies the potential disturbance to applicable PCEs. *Id.* For the first unit, the Oregon Inlet, the Service describes how the "overall number of piping plovers . . . has declined since the species was listed . . . corresponds to increases in the number of human users . . . and off-road vehicles." *Id.* at 62,831. It also describes how the location is one of "the first beach access points for off-road vehicles within Cape Hatteras National Seashore when traveling from the developed coastal communications of Nags Head, Kill Devil Hills, Kitty Hawk, and Manteo. As such, the inlet spit is a popular area for off-road vehicle users to congregate." *Id.* Further, one island located within the area "receives

dredge sediments from . . . maintenance dredging" and the "disposal of dredged sediments has the potential to disturb foraging and roosting plovers and their habitats." *Id.*

For the second unit, Cape Hatteras point, the Service describes how the location is located near the largest community on Hatteras Island and for that reason, is a popular area for off-road vehicle use and recreational fishing. As a result, the Service concluded that the sandy beach, mud, and sand flat habitats in the unit may require special management considerations. *Id.*

For the third unit, Hatteras Inlet, the Service describes how the location is southernmost point of Cape Hatteras National Seashore that can be reached without having to take a ferry. As such, the location is a popular off-road vehicle and recreational fishing area. Further, the adjacent islands are easily accessed by boats, which are launched from nearby marinas. As a result, the sandy beach, mud and sand flat habitats may require special management considerations. Finally, the Service describes how the fourth unit, Ocracoke Island, can only be accessed by ferry, and is thus a popular destination spot for vacationers in search of seclusion, which brings with it off-road vehicle use and recreational fishing. *Id.*

The Service is required to determine that the areas it designates contain PCEs "which may require special management considerations or protection." The Service complied with this requirement by describing the natural features of each unit, the impact of increased visitor use for each unit as well as the potential from dredge and sediment deposits on units one and four. Simply put, the Service identified a rational connection between the facts found and the choices it made.

### b. The Service Adequately Addressed Existing Management Plans in Designating Critical Habitat

Plaintiffs contend that the Service improperly relied on a district court decision holding that if a habitat is already under some sort of management for its conservation, that particular

habitat requires special management considerations or protection and therefore meets the definition of critical habitat. *See Center for Biological Diversity v. Norton*, 240 F. Supp. 2d 1090 (D. Ariz. 2003) (*CBD*). The district court decision relied on by the Service explains that "the fact that a particular habitat does, in fact, require special management is demonstrative evidence that the habitat is 'critical.' . . . [T]he position that if a habitat is actually under 'adequate' management, then the habitat is per se not critical . . . makes no sense." *CBD*, 240 F. Supp. 2d at 1099. In reaching this conclusion, the court reasoned that "[a] habitat would not be subject to special management and protection if it were not essential to the conservation of the species." *Id.* Specifically, the *CBD* court overturned the critical habitat designation for the Mexican spotted owl in part based on the Service's decision to exclude land from the designation after finding that existing management plans were adequate and thus that the lands did not meet the definition of critical habitat. *CBD*, 240 F. Supp. 2d at 1097-1103.

Here, the Service did not initially propose certain areas under existing management plans for designation as critical habitat because it found that the management plans for the areas provided adequate protection to the species and thus did not meet the definition of critical habitat under the ESA. AR 001527-28. However, the Service reconsidered its initial determination in light of the *CBD* decision and determined that the previously excluded areas "should be proposed as critical habitat." AR 006152.

Plaintiffs contend that this policy shift is arbitrary and that the Service improperly relied on *CBD*. This Court disagrees. Primarily, the Service did not rely solely on the *CBD* decision. The Service gives adequate factual reasons, independent of the *CBD* decision, for changing its mind to include these previously excluded areas. The final rule provides that the "additional areas are located within the range of the population, were occupied at the time of listing and are

currently occupied, and contain habitat features essential for the conservation of the wintering piping plover, as described in the 'Primary Constituent Elements' section of our June 12, 2006, rule."[2] 73 Fed. Reg. at 62,817-18. Additionally, the final rule designation determinations do not rely exclusively on the *CBD* decision. As noted above, the final rule explains the special management needs of the PCEs on the unit areas that plaintiff challenge.

Further, "[a]n agency's interpretation of a statute is entitled to no less deference . . . simply because it has changed over time." *Alabama Educ. Ass'n v. Chao*, 455 F.3d 386, 396 (D.C. Cir. 2006) (quoting *Nat'l Home Equity Mortgage Ass'n v. Office of Thrift Supervision*, 373 F.3d 1355, 1360 (D.C. Cir. 2004)). "Rather, the question raised by the change is whether the [agency] has supported its new reading of [the statute] with a reasoned analysis sufficient to command our deference under *Chevron*. *Id.* The CBD decision supports its conclusions with reasoned analysis and the Service is permitted to adopt the CBD court's rationale for its shift in policy. Even if the Court were to believe the shift is not the best construction, the Court is "obliged to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Id.* (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005)).

---

[2] These essential features "include sand and/or mud flats with no or very sparse emergent vegetation. In some cases, these flats may be covered or partially covered by a mat of blue-green algae. Adjacent unvegetated or sparsely vegetated sand, mud, or algal flats above high tide are also essential, especially for roosting piping plovers. Such sites may have debris, detritus (decaying organic matter), or micro-topographic relief (less than 50 cm above substrate surface) offering refuge from high winds and cold weather. Essential components of the beach/dune ecosystem include surf-cast algae for feeding of prey, sparsely vegetated backbeach (beach area above mean high tide seaward of the dune line, or in cases where no dunes exist, seaward of a delineating feature such as a vegetation line, structure, or road) for roosting and refuge during storms, spits (a small point of land, especially sand, running into water) for feeding and roosting, salterns (bare sand flats in the center of mangrove ecosystems that are found above mean high water and are only irregularly flushed with sea water) and washover areas for feeding and roosting. Washover areas are broad, unvegetated zones with little or no topographic relief that are formed and maintained by the action of hurricanes, storm surge, or other extreme wave action. Several of these components (sparse vegetation, little or no topographic relief) are mimicked in artificial habitat types used less commonly by piping plovers, but that are considered critical habitat (e.g., dredge spoil sites)." 71 Fed. Reg. 33707.

Finally, plaintiffs assert that the Service's "arbitrariness of this unexplained shift is reflected in an internal FWS staff email," which states that the change "clearly indicates . . . that we've made some determination that existing management of these sites may be inadequate." AR 257. However, the Service never declared the reason in including previously excluded areas was based on the inadequacy of the existing management plans. To the contrary, in basing its decision on *CBD*, the Service determined only that these areas should be designated as critical habitat. As such, the Court finds the Service set forth a rational connection between the facts and the choice it made.

### c. The Service Adequately Addressed the Interim Plan in Designating Critical Habitat

The ESA requires the Service to "designate critical habitat, and make revisions thereto, under subsection (a) (3) of this section on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2).

Plaintiffs contend that the Service was required to give consideration to NPS's interim plan regarding off-road vehicle usage as a relevant impact under the ESA. Plaintiffs assert that the plan was never thoroughly reviewed or adequately assessed. However, the Service has considerable discretion as to what it defines to be "other relevant impacts" under the ESA. The final revised rule provides:

> We consider a number of factors in a section 4(b)(2) analysis. For example, we consider whether . . . the landowners have developed any conservation plans for the area, or whether there are conservation partnerships that would be encouraged by designation of, or exclusion from, critical habitat. . . . We also consider any social impacts that might occur because of the designation.

> In this instance, we have determined that . . . there are currently no habitat conservation plans . . . . We anticipate no impact . . . habitat conservation plans

19

from this critical habitat designation. Therefore, there are no areas excluded from this final designation based on non-economic impacts.

73 Fed. Reg. at 62,833-834.

The Service's conclusion is reasonable in relation to the role of the interim plan. The interim plan has nothing to do with the wintering piping plover; it focuses primarily on breeding piping plovers and other species of shorebirds and sea turtles. The interim plan also does not govern all of the areas subject to the Service's critical habitat designation. Further, the interim plan's focuses on off-road vehicle use, not all recreational uses that may impact the critical habitat of the piping plover. Finally, the interim plan is temporary.

Even if plaintiffs' argument did not suffer these fatal flaws, it is settled that the ESA does not authorize "nondesignation of habitat when designation would be merely less beneficial to the species than another type of protection." *Natural Res. Def. Council v. U.S. Dep't of Interior*, 113 F.3d 1121, 1127 (9th Cir. 1997); *see also N. Spotted Owl v. Lujan*, 758 F. Supp. 621, 629 (W.D. Wash 1991) ("That [a coalition of government entities] was working to develop conservation strategies for the spotted owl did not relieve the Service of its obligation under the ESA to designate critical habitat to the maximum extent determinable."); *Middle Rio Grande Conservancy Dist. v. Babbitt*, 206 F. Supp. 2d 1156, 1169 (D.N.M. 2000) ("The [ESA] compels the designation [of critical habitat] despite other methods of protecting the species the Secretary might consider more beneficial."

### d. The Service Properly Exercised Its Discretion in Not Excluding Areas From the Critical Habitat Designation

The Service has discretion when it comes time to decide whether to exclude areas from a critical habitat designation. 16 U.S.C. § 1533(b)(2); 50 C.F.R. § 424.19; *see also CHAPA I*, 344 F. Supp. 2d. at 127. Specifically, "[t]he Secretary may exclude any area from critical habitat if he

determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned." 16 U.S.C. § 1533(b)(2).

Here, the Service decided not to exclude any areas. 73 Fed. Reg at 62,834 ("there are no areas excluded from this final designation based on non-economic impacts"); *Id.* at 62,835 ("Because our economic analysis did not identify any disproportionate costs that are likely to result from the designation, we did not consider excluding any areas from this designation of critical habitat for the wintering population of piping plover in North Carolina based on economic impacts.).

Although there is a strong presumption that agency action is reviewable, *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971); *Abbott Labs. v. Gardne*r, 387 U.S. 136, 140 (1967), the APA codifies the traditional exception that agency action is not reviewable when it is "committed to agency discretion by law." 5 U.S.C. § 701(a); *see Heckler v. Chaney*, 470 U.S. 821, 828 (1985); *Sec. of Labor v. Twentymile Coal Co*., 456 F.3d 151 (D.C. Cir. 2006). In *Overton Park*, the Supreme Court declared that this exception to the presumption of reviewability applies "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." 401 U.S. at 410.  As the Court subsequently explained in *Heckler v. Chaney*, "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." 470 U.S. at 830. "In such circumstances, the courts have no legal norms pursuant to which to evaluate the challenged action, and thus no concrete limitations to impose on the agency's exercise of discretion." *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002).

In the instant case, the Service's decision is unreviewable pursuant to the APA because there is no standard for the Court to apply to the agency's exercise of discretion to not exclude any areas. The statute states that the Service "may exclude any area from critical habitat if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines . . . the failure to designate such area as critical habitat will result in the extinction of the species concerned." 16 U.S.C. 1533 (b)(2). The plain reading of the statute fails to provide a standard by which to judge the Service's decision not to exclude an area from critical habitat. The Court's decision is in accord with another district court faced with the same question. *See Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*, 2006 WL 3190518, at *20 (E.D. Cal. Nov. 2, 2006). In that case, the court concluded that it had "no substantive standards by which to review the Service's decisions not to exclude certain tracts based on economic or other considerations, and those decisions are therefore committed to agency discretion." *Id.* This Court agrees and concludes the Service's decision not to exclude areas from the critical habitat designation is not reviewable pursuant to the APA.[3]

### e. The Service Adequately Considered Economic Impacts in Designating Critical Habitat

The ESA directs that the "Secretary shall designate critical habitat . . . on the basis of the best scientific data available and after taking into consideration the economic impact . . . of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). When using this and other relevant data to inform its decision, the Service has wide discretion in determining whether to exclude particular areas. *Arizona Cattle Growers' Ass'n v. Kempthorne*, 534 F. Supp. 2d

---

[3] Even if the agency's decision was reviewable, the record supports the agency's decision not to exclude. *See* 73 Fed. Reg. at 62,835 (The FWS analysis "did not identify any disproportionate costs that are likely to result for the designation); *Id.* at 62, 834 ("[W]e have determined that the lands designated as critical habitat for the wintering population of piping plover in North Carolina are not owned or managed by the Department of Defense, there are currently no habitat conservation plans, and the designation does not include any Tribal lands or trust resources. We anticipate no impact to national security, Tribal lands, partnerships, or habitat conservation plans from this critical habitat designation.).

1013, 1032 (D. Ariz. 2008). To this effect, the ESA provides that the Service "may exclude any area from critical habitat if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat." 16 U.S.C. § 1533(b)(2). This discretion is limited only to the extent that the Service may not exclude areas from a designation if it determines that "failure to designate such area as critical habitat will result in the extinction of the species." *Id.*

In *CHAPA I*, the Court considered two approaches to conducting the economic analysis required as part of the process of designating critical habitat under the ESA – the "functional equivalence approach" and the "baseline approach." *CHAPA I*, 34 F. Supp. 2d. 126-33. The Court concluded that the baseline approach was the appropriate method. *Id.* The baseline approach requires the Service to compare "the state of the world without or before the designation, the baseline, with the state of the world with or after the designation." *Id.* at 127. In other words, the Service must "consider[] those economic impacts that would not have occurred but for the critical habitat designation," not any and all economic impacts that were also attributable to the listing of the species. *Arizona Cattle Growers' Ass'n*, 534 F.Supp.2d at 1032. If the Service was to include those costs that are "attributable co-extensively to other causes," the economic impact method would be inconsistent with the ESA. *Id.* at 1033-35. As stated by the District of Arizona Court,

> Where a coextensive approach is taken, the Service goes beyond the command of the ESA by examining impacts that exist independent of the critical habitat designation. This only inhibits the resolution of the ultimate question-whether economic impacts suggest that exclusion of certain areas outweighs the benefits of inclusion-and confuses the real costs of making the designation. Additionally, this Court agrees that the inclusion of coextensive costs implicitly violates the ESA's disallowance of consideration of economic factors at the time of listing. Consideration of coextensive impacts simply amounts to a backhanded method of recognizing costs which could not legally be examined during listing. Finally, an

expansive interpretation of "economic impacts" is contradictory to the overall purpose of the ESA, which speaks only to conservation, without regard to costs or other economic considerations.

*Arizona Cattle Growers' Ass'n*, 534 F.Supp.2d at 1035.

In *CHAPA I*, the court remanded the critical habitat designation to the Service to clarify its approach pursuant to the baseline approach. The *CHAPA I* remand order required the Service to clarify whether its economic analysis included costs related to the effects of off-road driving on the beaches and consultation with NPS. *CHAPA I*, 344 F. Supp. 2d at 132-33. In the instant case, plaintiffs do not challenge the Service's compliance with the court's order to clarify its economic analysis regarding consultation with NPS.

Plaintiffs contend that the revised final rule continues to rely on the functional equivalence doctrine and fails to clearly identify the baseline economic impacts or to perform a proper incremental baseline analysis to accurately assess the additional economic impacts of the designations. Specifically, plaintiffs state that the Service never considered how the costs of consultation for seven activities it lists which would require consultation would differ from Section 7 consultations for listing, given the lower consultation threshold necessary to meet the recovery objective of critical habitat. Plaintiffs also state the economic analysis fails to adequately address potential impacts to off-road vehicle usage and other administrative costs.

However, the revised Economic Analysis utilizes the baseline approach, albeit in a convoluted fashion. At the outset, the report explains that the "previous economic analysis failed to consider the effect of possible beach closures on off-road vehicle (ORV) use and potential administrative costs to the National Park Service (NPS) resulting from section 7 consultation. The current analysis focuses on these two sources of economic impacts, and the incremental

impacts that could result if additional beach closures are undertaken to protect plover critical habitat." Final Economic Analysis ES-1 ¶ 3; AR 7081.

### i. Administrative Cost Assessments

The Final Economic Analysis states that the "economic impacts of critical habitat designation involve evaluating the 'without critical habitat' baseline versus the 'with critical habitat' scenario. Impacts of designation equal the difference, or increment, between these two scenarios." Final Economic Analysis 1.4 ¶ 23; *see also* 73 Fed. Reg. at 62826 ("it is important to distinguish between impacts resulting from actions taken pursuant to the Consent Decree, which are considered as baseline to this analysis, because these impacts are assumed to occur absent a designation of critical habitat."). The economic analysis goes on to define the range of incremental costs, from a high-end estimate that assumes that incremental impacts would result from NPS closing additional areas of the beach beyond those that would be closed under current NPS management (i.e., in the absence of designation) to a low-end estimate that assumes no trips will be lost. *Id.* As such, the baseline includes all closures resulting from current management by NPS. *See* 73 Fed. Reg at 62826 ("closures [currently implemented] are considered baseline to this analysis in that they would be expected to occur regardless of the designation.") As such, the Service decided to make this the baseline based on the fact that all of the areas proposed for critical habitat designation are on land governed by NPS, thus subject to closure pursuant to the interim plan. *Id.* As a result the incremental costs used by the Service would be incurred only if there were additional closures based on critical habitat designation.

Additionally, the Service analysis evaluates baseline administrative costs in addition to future administrative costs. These administrative costs include environmental consultations. The economic analysis identifies a range of past formal, informal and technical assistance costs with

the same costs proposed through 2026. *See* Final Economic Analysis 4-4. The report identifies

that "[e]stimates of the cost of an individual consultation and technical assistance request were

developed from a review and analysis of historical section 7 files from a number of Service field

offices around the country conducted in 2002. These files addressed consultations conducted for

both listings and critical habitat designations. Cost figures were based on an average level of

effort of low, medium, or high complexity, multiplied by the appropriate labor rates for staff

from the Service and other Federal agencies." *Id.* at 4-1. The report summarizes past

administrative costs, including consultation costs and compares them to potential future

administrative costs. In other words, the report compares "the state of the world without or

before the designation, the baseline, with the state of the world with or after the designation."

*CHAPA I*, 344 F. Supp. 2d. at 127.

Plaintiffs contend that the Service was required to identify a specific dollar amount in

order to perform a mathematical calculation. *See* Pls.' Memo. In Opp'n to Defs.' Mot. for

Summ. J. and in Supp. of Pls.' Mot. for Summ. J. at 6. Specifically, plaintiffs point to *Arizona

Cattle Growers Ass'n v. Kempthorne*, 534 F. Supp. 2d 1013 (D. Ariz. 2008), in which the court

stated that "the economic impact created by a critical habitat designation is naturally the

mathematical difference between [the world with the designation compared to the world without

it]." Taken in isolation, the quote supports the position that a quantification of baseline costs is

required. However, the "mathematical difference" is being compared to a "coextensive

approach," which is an approach that takes into account all of the economic impacts of the

critical habitat designation, regardless of whether those impacts are caused coextensively by any

other agency action and even if those impacts would remain in the absence of the designation. In

effect, the court is simply comparing the baseline approach with the functional approach, rather than requiring a quantitative calculation of the baseline.

Federal defendants did not quantify the baseline costs. Instead, the Service followed the direction of the Court in *CHAPA I* by identifying a baseline, which in this case is a "no action baseline: what the world will be like if the proposed rule is not adopted." *CHAPA I*, 344 F. Supp. 2d at 130. Similarly, in *Arizona Cattle Growers Ass'n v. Kempthorne*, the court only required that the baseline impacts be excluded from the final calculations of costs. The Service conducted its baseline economic analysis in the same way a court upheld in *Fisher v. Slazar*, 656 F. Supp. 2d 1357 (N.D. Fla. 2009). In *Fisher*, the court determined that certain impacts were part of the baseline and that their costs were properly excluded from the costs attributed to the designation but did not require the agency to quantify the impacts with dollar amounts. *Id.* at 1372. Here, the Service identified and excluded similar baseline impacts. As such, plaintiffs fail to establish that the Service's administrative cost analysis is arbitrary and capricious.

### ii. Off-Road Vehicle Cost Assessments

Similarly, the Final Economic Analysis calculates and evaluates the baseline and incremental costs of changes to off-road vehicle use stemming from the potential critical habitat designation. Plaintiffs contest the Service' analysis of the economic impact the critical habitat designation will have on off-road vehicles because (1) the Service impermissibly failed to consider future closing by attributing them to the interim plan and consent decree; and (2) the analysis relies on unreliable information in determining the economic impact on local business and governments caused by the critical habitat designation.

The Service concluded that NPS undertakes "various management actions for the piping plover, including seasonal closures for the breeding population, year-round closures of important

foraging and roosting sites, continued predator removal, additional recreation use restrictions, and public outreach." Final Economic Analysis 2-6 ¶ 44. Further, "Because these costs were associated with a wide variety of species and still would be implemented absent the designation of critical habitat for the wintering population of the piping plover, this analysis does not attribute these costs to the designation of critical habitat." *Id.* The Court concludes that this is a reasonable conclusion. Plaintiffs can point to nothing in the record that demonstrates that the Service improperly attributed future closures to the Interim Plan of Consent Decree.

Plaintiffs also contend that the Service relied on flawed data. Specifically, plaintiffs contend that the methodology used in the analysis is flawed because (1) it fails to factor in impact variations due to the location of additional closures; (2) the study regarding off-road vehicles usage is inaccurate; and (3) the Service failed to consider information from business owners. Plaintiffs are incorrect that the data relied upon does not factor variations due to the location of the potential closure. In fact, the analysis assigns a uniform cost to all areas. Thus, the variations based on location are factored into the very beginning of the analysis. *See Id.* at 2-10—2-13. Additionally, plaintiffs do not identify any contrary data they want the Service to use in the analysis. As such, the methodology satisfies the best available data requirement. *See Center for Biological Diversity v. BLM*, 422 F. Supp. 2d 1115, 1159-51(N.D. Cal. 2006) (concluding that the approach used – assuming that off-road vehicle use was evenly distributed throughout the entire area – was consistent with the agency's obligation to use the best available data).

Similarly, plaintiffs contend that the Service improperly relied on a flawed study, the Vogelsong study, as the best available science and failed to explain why it did not rely on another study, the Neal study, which also contained flawed data. *See* 73 Fed. Reg. at 62824.

Both studies contain data on off-road vehicles visitation numbers at the Cape Hatteras Seashore. However, the Service clearly addresses plaintiffs' concerns in the final rule: "Despite the issues raised in the peer review, [the Service] believes that the results contained in the [Vogelsong study] represent the best available information to support an understanding of the potential economic impacts of this proposed designation, and that the manner in which the information from this study are applied . . . represents a reasonable application of the study consistent with the concerns raised in the peer review process." *Id.* The Final Economic Analysis contains further detail about the Service's decision to use to study. The Service acknowledged that "[t]his estimate has been criticized because: (1) it is based on a series of brief, on-site counts of ORVs rather than daily totals obtained from on-site observation throughout the entire day; and (2) it is not based on a "probability sample" of visitors (i.e., a sample in which each visitor has an equal probability of being selected to respond to the survey)." Final Economic Study 2-13 ¶ 70. Further, the report addressed the concerns with the study:

> (1) The brief, on-site counts will provide reasonable estimates of the number of ORV visits if all ORV visitors spend the entire day at the beach. If visits tend to be shorter than a day, then these brief counts will likely miss a portion of the ORV visitors. In particular, ORV visitors will not be counted if their entire visit occurs either before or after the survey personnel arrive on site. This will lead to an underestimate of the total number of ORVs. It would be difficult to adjust the estimates from this survey to address this issue, as the degree of potential bias would depend on many unknown factors, including the distribution of ORV trip lengths, arrival/departure times, and the times selected for the on-site counts. While this analysis acknowledges that Vogelsong's approach may underestimate ORV visitation, these are the currently best available data, the biases in the results obtained using these data are well understood and described herein.

> (2) The Vogelsong report does not provide a detailed description of the sampling approach and estimation methodology. Lacking this, this analysis assumes that a probability sample was not used. However, it does appear that Vogelsong sampled on a reasonably large number of days (both weekdays and weekends) well distributed through the year, and that the sampling covered the major beach areas used by ORVs. While probability sampling is clearly preferable for this type

of study, this analysis expects that the Vogelsong study is sufficiently representative for use in our analysis.

Final Economic Analysis 2-13—2-14. Given a choice between two flawed studies, the Service adequately explained its choice to rely on the Vogelsong study.

Finally, plaintiffs contend that the economic analysis is flawed because it does not rely on information provided from local business owners. The Service addresses this issue in the final rule: "A survey regarding the specific potential effects of management closures on individual business is beyond the scope of this analysis. The [draft economic analysis] used best available data on such factors as the size and annual sales of business collected . . ." 73 Fed. Reg. at 62854. The Service was not required to conduct additional studies. *See Sw. Ctr. For Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000); *City of Las Vegas v. Lujan*, 891 F.2d 927, 933 (D.C. Cir. 1989).

### f. NEPA

Congress passed the National Environmental Policy Act (NEPA) in 1969 in order to insure that all agencies of the federal government consider the environmental effects of proposed actions. *Sierra Club v. Watkins*, 808 F.Supp. 852, 858 (D.C.D. 1991). NEPA's primary purpose is to make certain "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Roberston v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). In addition to providing information to the decisionmakers at the agency, NEPA also "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Id.* This audience includes the public because the documentation "gives the public the assurance that the agency has indeed considered environmental concerns in its decisionmaking process, and, perhaps more

significantly, provides a springboard for public comment." *Sierra Club v. Watkins*, 808 F.Supp. at 858 (quoting *Baltimore Gas & Electric Co. v. Natural Resources Defense Council*, 462 U.S. 87, 97 (1983); *Robertson*, 490 U.S. at 349). Instead of "mandating particular environmental results, NEPA imposes procedural requirements on federal agencies to analyze the environmental impact of their proposals and actions." *O'Reilly v. United States Army Corp of Engineers*, 477 F.3d 225, 228 (5th Cir. 2007).

At the heart of NEPA is § 4332(a)(C), which requires that a government agency prepare an environmental impact statement (EIS) whenever a proposed government action qualifies as a "major Federal action significantly affecting the quality of the human environment." *See Balt. Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 97 (1983). Specifically, NEPA requires, "to the fullest extent possible," all agencies of the federal government to prepare environment impact statements for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). When it is not readily discernible how significant the environmental effects of a proposed action will be, federal agencies may prepare an Environmental Assessment ("EA"). 42 U.S.C. § 4332(2)(E); *see also* 40 C.F.R. § 1501.4(b). In other words, an environmental assessment (EA) is made in order to determine whether an EIS is required. *See* 40 C.F.R. § 1508.9; *Grand Canyon Trust v. Federal Aviation Administration*, 290 F.3d 339, 340 (D.C. Cir. 2002). Specifically, an EA is a "concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). Federal agencies must comply with NEPA "to the fullest extent possible." 42 U.S.C. § 4332.

Under the "long-established standard in this circuit," the court reviews an agency's finding of no significant impact, or in other words, decision to not prepare an EIS, in order to

determine whether the agency has accurately identified the relevant environmental concerns and has taken a "hard look" at the potential environmental consequences of their actions.  *Grand Canyon Trust*, 290 F.3d at 340. Specifically, the agency must (1) accurately identify the relevant environmental concern; (2) take a "hard look" at the environmental consequences of the action; (3) make a "convincing case" that the potential environmental impact is not significant enough to require a EIS; and (4) show that "even if there is an impact of true significance, [an EIS] is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum."[4] *Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23, 29 (D.C. Cir. 2008) (citing *TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006)); *see also Robertson*, 490 U.S. at 350.

However, because NEPA is a procedural and not a results-driven statute, even agency action with adverse environmental effects can be NEPA-compliant so long as the agency has considered those effects and determined that competing policy values outweigh those costs. *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 191 (4th Cir. 2009) (citing *Robertson*, 490 U.S. at 350.)   Even if the court finds the contrary views more persuasive, the court will not second-guess the agency's decision so long as the agency followed NEPA's procedures. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

Plaintiffs contend that the Service's EA is deficient because (1) its discussion of environmental consequences regarding impact to recreational, economic, and social resources relies heavily on a flawed economic analysis; and (2) it lacks sufficient information regarding the

---

[4] The additional requirement to make a "convincing case" differs somewhat from the requirements of *Overton Park*. The Court of Appeals determined that this additional requirement is appropriate in the context of the NEPA: "This burden should rest on the Government, both because of the high value placed on the protection of the environment by the National Environmental Policy Act of 1969, and because of the risk of error which results from not writing an impact statement on a project requiring one." *Md.-Nat'l Capital Park & Planning Comm'n v. U.S. Postal Serv.*, 487 F.2d 1029, 1040 n.10 (D.C. Cir. 1973) (citing *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615 (D.C. Cir. 1973)).

importance of the Cape Hatteras Seashore as wintering habitat and its relation to the wintering piping plover populations throughout the nation. Both contentions are unsupported by the record.

First, as already discussed, the Service adequately described its decision to use the flawed Vogelsong economic study and not the flawed Neal economic status. Further, the Service's methodology satisfies NEPA because NEPA allows the agency the discretion of what methodology to use and does not require the use of the best scientific methodology available. *See Sierra Club v. DOT*, 753 F.2d 120, 128-29 (D.C. Cir. 1985) (it is "clearly within the expertise and the discretion of [the agency] to determine proper . . . testing methods.") *see also, Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1130 (8th Cir.1999) ("[Courts] defer to the agency's choice of methodology as long as it is not arbitrary or without foundation."); *Oregon Envt'l Council v. Kunzman*, 817 F.2d 484, 496 (9th Cir.1987) ("NEPA does not require that we decide whether an [EIS] is based on the best scientific methodology available, nor does NEPA require us to resolve disagreements among various scientists as to methodology."). Additionally, the EA adequately considers the impact of critical habitat designation on recovery of the wintering piping plover. *See* AR 7246; 7253; 7261.

## VI.    Conclusion

An agency decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43. Plaintiffs here have demonstrated nothing of the sort. The Service has fulfilled its statutory duties pursuant to ESA

and NEPA. While plaintiffs have standing to bring this action, the Service properly designated and evaluated the special management considerations for each primary constituent element as required by the ESA. Further, the Service properly considered economic and other impacts as required by the ESA. Finally, after taking a "hard look" at the potential environmental consequences, the Service correctly determined that an EIS was not required pursuant to NEPA.

For the reasons set forth in this opinion, plaintiff's motion for summary judgment will be denied. Likewise, government defendants' cross-motion for summary judgment will be granted and intervening defendants' cross-motion for summary judgment will be granted.

A separate order shall issue this date.


August 17, 2010                                     /s/ Royce C. Lamberth
                                                    Chief Judge
                                                    United States District Court